## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NOVINGER'S, INC., | : | CIVIL ACTION NO. 1:18-CV-1145 |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| A.J.D. CONSTRUCTION CO., INC., | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Novinger's, Inc. ("Novinger's"), advances claims for breach of contract and *quantum meruit* against defendant A.J.D. Construction Co., Inc. ("AJD"). AJD asserts a breach-of-contract counterclaim. Before the court are the parties' cross-motions for partial summary judgment.

## I. Factual Background & Procedural History[1]

Novinger's is a Pennsylvania corporation and specialty subcontractor "engaged in furnishing and installing drywall, acoustical ceilings, metal studs, lath and plaster, fireproofing, stucco, and exterior wall finishes on structural steel

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 56-1, 62, 68, 75-9.) To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

studs." (Doc. 56-1 ¶¶ 1-2; Doc. 75-9 ¶¶ 1-2). AJD is a New Jersey corporation and a general contractor engaged in construction. (Doc. 56-1 ¶¶ 4-5; Doc. 75-9 ¶¶ 4-5).

### A.    "Journal Squared" Project and Novinger's-AJD Subcontract

AJD entered into a prime contract with Journal Square I Urban Renewal, LLC (the "Owner"), regarding a project known as "Journal Squared - Tower I." (Doc. 56-1 ¶ 6; Doc. 75-9 ¶ 6; Doc. 61-37 (prime contract)). The Owner enlisted AJD to assist in the development of a 53-story, high-rise building containing residential units, mechanical space, retail space, and a parking structure. (Doc. 75-9 ¶ 6; see Doc. 56-1 ¶ 6). We refer to this project as the "Journal Squared Project." Three sections of the building, the precise contours of which the parties dispute, are relevant to the instant motions: the "Podium," the "Tower," and the "Mechanical Room Area."[2] (Doc. 56-1 ¶¶ 7-10; Doc. 75-9 ¶¶ 7-10). The Podium is the lowermost segment of the building; the Tower begins at the eighth floor and extends to the top of the building; and the Mechanical Room Area is located near the top of the building. (See Doc. 56-1 ¶¶ 7-10; Doc. 75-9 ¶¶ 7-10).

---

[2] The parties and witnesses in this case refer to the Mechanical Room Area interchangeably as the elevator machine room, the EMR, and the penthouse area. (See, e.g., Doc. 56-1 ¶ 10; Doc. 75-9 ¶ 8).

AJD and Novinger's executed a subcontract regarding the Journal Squared Project.[3]  (See Doc. 57-1, Ex. A).[4]  Pursuant to the subcontract, Novinger's agrees to "design, fabricate, deliver and install a panelized exterior heavy gauge wall system extending from elevation 77'8" to 572'7".  The exterior wall section details to accommodate a panelized light gauge metal stud system, configured as a column and slab cover that will bypass the edge of slab."  (Rider A ¶ 24; see also id. at 1).  The subcontract explains that "framing sizes and gauges will be determined by" AJD's engineer, and "stud gauges will vary depending on the most economical way to achieve specified" criteria.  (Id. ¶ 26).  None of these criteria are intended to limit Novinger's' scope of work.  (Id. at 1).  In return, AJD agrees to pay Novinger's a lump sum of $8,798,820.  (See Subcontract, Art. 10 § 10.1).

Under the subcontract, AJD may "order changes in the Work consisting of additions, deletions, and revisions."  (Rider C2, Art. 19 ¶ 19.1).  This provision gives AJD the right to

> delete Work from the Contract for any reason whatsoever and to direct other Subcontractors/Suppliers to perform such work, and in such event Subcontractor/Supplier shall have no claim against [AJD] or Owner for such deletion of work or for breach of Contract.  The Contract

---

[3] There is a factual dispute over the date of execution of the subcontract. AJD claims the parties executed the subcontract on or about July 30, 2014.  (Doc. 62 ¶ 39; Doc. 75-9 ¶ 19).  Novinger's maintains it delivered a signed contract to AJD on October 29, 2014, (see Doc. 56-1 ¶ 40), and subsequently received a fully executed copy from AJD on November 5, 2014, (id. ¶ 41; Doc. 68 ¶ 39).  Given the plethora of factual issues sub judice, this particular dispute is immaterial to the court's disposition.  Obviously, it will be an additional matter for resolution by the factfinder.

[4] We cite to the subcontract herein as "Subcontract at __" or "Subcontract, Art. __ § __" and to its multiple riders as "Rider __ at __" or "Rider ¶ __."

> Price and completion time requirements shall be adjusted
> as set forth below to the extent that Owner in its sole
> discretion agrees to such adjustment.

(Id.)  Conversely, if Novinger's has a claim against AJD, Article 5, Section 5.3

requires Novinger's to "make all claims promptly . . . for additional cost, extensions

of time and damages for delays" in connection with the subcontract's performance.

(Subcontract, Art. 5 § 5.3).  A "claim" is a

> demand or assertion by [AJD] or Owner seeking, as a
> matter of right, adjustment or interpretation of Contract
> terms, payment of money, extension of time, specific
> performance, or other relief with respect to the terms of
> the Contract.  The term "Claim" also includes other
> disputes and matters in question between the Owner and
> [AJD] arising out of or relating to the Contract.

(Doc. 61-37, Art. 4 § 4.3.1 (prime contract); Subcontract, Art. 1 § 1.1).[5]

The subcontract also includes provisions governing AJD's potential options

should Novinger's fail to abide by its contractual obligations.  As relevant here, AJD

may file "claims for the costs of services or materials provided due to [Novinger's']

failure" to perform after seven days' notice that AJD intends to secure substitute

services or materials.  (Id., Art. 3 § 3.3.2(.1)).  The subcontract further requires AJD

to provide Novinger's with written compilations of services and materials provided

in lieu, as well as their respective charges, by the fifteenth day of the month after

such provision.  (Id. § 3.3.2(.2)).  Alternatively, if Novinger's "defaults or neglects" to

---

[5] The subcontract incorporates by reference the prime contract and its terms. (Subcontract, Art. 1 § 1.1).  It also states that "[AJD] shall assume toward [Novinger's] all obligations and responsibilities that the Owner, under such documents, assumes toward [AJD], and [Novinger's] shall assume toward [AJD] all obligations and responsibilities which [AJD], under such documents, assumes toward the Owner and the Architect."  (Id., Art. 2).

perform its work, AJD may "make good such deficiencies and . . . deduct the reasonable cost thereof from the payments" due, so long as it provides Novinger's five days' notice "to commence and continue correction of such default or neglect with diligence and promptness." (Id. § 3.4).

Relatedly, the subcontract establishes a process by which AJD can withhold payment from Novinger's if Novinger's fails to resolve claims arising from its performance of the subcontract. "Before issuance of the final payment, [Novinger's], if required, shall submit evidence satisfactory to [AJD] that all payrolls, bills for materials and equipment, and all known indebtedness connected with the [Novinger's'] Work have been satisfied." (Subcontract, Art. 12 § 12.2). In another section, the subcontract provides that AJD may refuse payment if there are "[c]laims filed or evidence indicating probable filing or making of claims." (Rider C2, Art. 18 ¶¶ 18.8, 18.8.2). Article 18, Paragraph 18.17 of Rider C2 also permits withholding upon "evidence of any unpaid obligation, lien or claims for which, if established, [AJD] or Owner . . . might become liable." (Id. ¶ 18.17).

To receive final payment, Novinger's must submit "a full and final release and waiver of all liens and claims in connection with the Work . . . by each subcontractor or supplier who has performed work or supplied materials" on the subcontractor's or supplier's behalf. (Id. ¶¶ 18.11, 18.11.1; see also id. ¶ 18.12). Acceptance of final payment "shall constitute a release of Owner and [AJD] of and from all liability" associated with the project. (Id. ¶ 18.12). Additionally, "[a]cceptance of final payment by [Novinger's] shall constitute a waiver of claims by [Novinger's], except those previously made in writing and identified by [Novinger's]

as unsettled at the time of final application for payment."  (Subcontract, Art. 12 §
12.2).

The subcontract includes an integration clause stating that the "Subcontract
represents the entire and integrated agreement between the parties hereto and
supersedes prior negotiations, representations or agreements, either written or
oral."  (Id., Art. 1 § 1.1).  It separately provides that the "agreement supersedes and
replaces all previous written and oral agreements, proposals, etc."  (Rider A ¶ 8; see
also Rider D ¶ 14 ("The subcontractor agrees this agreement supersedes, replaces
and voids all previous proposals, agreements whether verbal or written and is the
only agreement between both parties on record.")).

### B.    Dispute Regarding Novinger's Scope of Work

The parties each claim that preliminary negotiations and discussions inform
the scope of Novinger's' work.  They agree that AJD originally intended to employ
Bamco, Inc. ("BAMCO"), as its subcontractor for part of the Journal Squared
Project.  (Doc. 56-1 ¶ 16; Doc. 75-9 ¶ 16).  They also agree that Novinger's ultimately
replaced BAMCO.  (Doc. 62 ¶¶ 6-8; Doc. 56-1 ¶¶ 16-18).  They dispute, however, the
extent of the work BAMCO was intended to perform and, consequently, the role
Novinger's was intended to assume.  (Doc. 56-1 ¶¶ 17-18; Doc. 75-9 ¶¶ 17-18).  James
Novinger, President of Novinger's, explained in a declaration that BAMCO referred

Novinger's to AJD because BAMCO could not complete the panel prefabrication work on the Tower, but Novinger's could.  (Doc. 57-2, Ex. F ¶ 4).[6]

The parties engaged in extensive negotiations regarding the scope of Novinger's' work.  Novinger's submitted five proposals to AJD over the course of roughly two months which only add to the parties' confusion about the scope of performance under Novinger's subcontract.  In the first, dated February 26, 2014, Novinger's proposes only to "[f]urnish and install a panelized wall system extending from elevation 77'8" to 572'7"."  (Doc. 61-7 at 1).  Novinger's notes that its proposal "accommodate[s] a panelized light gauge metal stud system" that would "bypass and attach to the structure."  (Id.)  It also flags necessary framing and sheathing. (Id.)  On March 14, 2014, Novinger's submitted its second proposal identifying these same items, now under a "Tower Overview" heading, and similarly noting framing and sheathing.  (See Doc. 61-32 at 1).  Unlike the earlier proposal, this one includes Podium work.  (See id.)  Neither mentions the Mechanical Room Area.  (See id.; see also Doc. 61-7).

On March 15, 2014, Jayanti Patel, AJD's Project Manager for the Journal Squared Project, emailed Novinger's and asked it to "provide colored evaluation [drawings] indicating scope of [its] work."  (Doc. 62 ¶ 20 (alterations in original)).  In

---

[6] To the extent AJD claims that this evidence, which is based on conversations with other individuals, must be excluded as inadmissible hearsay, we are unpersuaded.  "[H]earsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial.*"  Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) (quoting Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

response, Novinger's supplied a highlighted version of the building blueprint identifying the space reaching up to 572'7" as within its scope of work.  (Id. ¶¶ 21-23; Doc. 61-33).  AJD contends this highlighted portion encompasses the Mechanical Room Area.  (Doc. 62 ¶ 22).  Novinger's disputes whether these drawings are accurate, complete, or up-to-date.  (Doc. 68 ¶¶ 21-23).

Novinger's submitted a third proposal on March 25, 2014, the relevant portions of which did not materially change.  (See Doc. 61-34 at 1).  Like prior iterations, this proposal does not expressly speak to the Mechanical Room Area. (Id.)  One month later, on April 25, 2014, Novinger's submitted a fourth proposal, which again describes a panelized wall system "extending from elevation 77'8" to 572'-7"."  (Doc. 61-35 at 1).  Unlike the prior proposals, however, this one specifies "exterior wall section details to accommodate a panelized light gauge metal stud system, configured as a column and slab cover that will bypass the edge of slab." (Id.)  It further specifies that Novinger's "will provide imbeds for panel attachment," that "framing sizes and gauges will be determined by our engineer[, and that] stud gauges will vary depending on the most economical way to achieve specified deflection criteria."  (Id.)  This proposal expressly excludes Podium work and again fails to mention the Mechanical Room Area.  (Id. at 2; Doc. 62 ¶ 30).  On May 5, 2014, Novinger's submitted a fifth and final proposal which is substantially similar to its April 25 proposal.  (Doc. 61-36; Doc. 62 ¶ 32; Doc. 68 ¶ 32).

Before installing the system, Novinger's submitted "shop drawings" to AJD regarding its planned work.  (Doc. 62 ¶ 52; Doc. 68 ¶ 52; Doc. 56-1 ¶ 35).  According to Novinger's, it submitted these shop drawings in August and September of 2014,

and discussed those drawings with AJD in October of 2014.  (Doc. 56-1 ¶¶ 35-37; Doc. 68 ¶¶ 52-53).  Novinger's then began installing the exterior panelized wall system. (Doc. 62 ¶ 51; Doc. 68 ¶ 51; Doc. 56-1 ¶¶ 43-44).  Roughly one year after Novinger's submitted its shop drawings, in September 2015, AJD asked Novinger's why it had not submitted shop drawings for the Mechanical Room Area.  (Doc. 62 ¶¶ 53-54; Doc. 68 ¶¶ 53-54; see also Doc. 56-1 ¶ 36).  This factual dispute, among others, lead inexorably to the instant litigation.

Subsequent to the dispute over Novinger's scope of work, AJD enlisted BAMCO and paid it $489,000 to perform work on the Mechanical Room Area.  (Doc. 62 ¶¶ 59-60; Doc. 68 ¶¶ 59-60).  AJD issued a "deduct change order" to Novinger's in the amount of $489,000.  (Doc. 62 ¶¶ 61, 63; Doc. 68 ¶¶ 61, 63).

Upon completion of its perceived scope of work, Novinger's submitted a request for payment to AJD with an adjusted subcontract price of $9,425,282.19. (Doc. 62 ¶¶ 68-70; Doc. 68 ¶¶ 68-70).  Novinger's executed a partial release for payment on May 5, 2017.  (Doc. 62 ¶¶ 73-74; Doc. 68 ¶¶ 73-74).  AJD released $8,856,294.80 in payment.  (Doc. 62 ¶ 75; Doc. 68 ¶ 75).  By letter dated June 9, 2017, Novinger's requested payment in the amount of $568,987.39, consisting of $14,497.52 in pay application fees and $554,489.87 in unpaid retainage.  (Doc. 56-1 ¶ 52; Doc. 75-9 ¶ 52).  Novinger's has not provided contractually required close-out documents, but states it is prepared to do so upon receipt of full payment.  (Doc. 56-1 ¶ 58).

### C.    Novinger's Claims for Extra Costs

After completing its work on the Journal Squared Project, Novinger's submitted a breakdown totaling $119,946.77 for costs associated with certain

cleaning work it performed.  (Doc. 62 ¶ 76; Doc. 68 ¶ 76).  Novinger's also submitted

a breakdown totaling $171,352.53 for costs associated with removing and

reinstalling certain safety cables.  (Doc. 62 ¶ 79; Doc. 68 ¶ 79).

### D.   AWMC-Novinger's Dispute

AJD has purportedly withheld payment to Novinger's in part because of a

$68,400 claim against Novinger's by Architectural Window Manufacturing

Corporation ("AWMC").  (Doc. 56-1 ¶ 55; Doc. 75-9 ¶¶ 74-79).  By letter dated

September 8, 2017, AWMC wrote to Novinger's, demanding payment for costs

incurred due to a defective mockup by Novinger's during the Journal Squared

Project.  (Doc. 75-9 ¶ 76).  AWMC notified AJD of this claim against Novinger's.  (Id.

¶ 77).  As far as we are aware, AWMC's claim remains pending.  (See id. ¶ 78).  On

July 31, 2020, AWMC's counsel wrote to Novinger's again, increasing its demand to

$100,900 for the same alleged failure.  (Id. ¶ 79).

### E.   Procedural History

Novinger's originally filed this case in the Court of Common Pleas of

Dauphin County, Pennsylvania, before AJD timely removed the matter to this

court.  Novinger's asserts claims for breach of contract and *quantum meruit*.  AJD

asserts a reciprocal breach-of-contract counterclaim.  Following a period of

discovery, Novinger's and AJD both filed motions for partial summary judgment.

The motions are ripe for disposition.

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that

do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

Courts may resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. FedEx, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.  **Discussion**

Before disposing of the pending motions, we must address two threshold evidentiary issues raised by Novinger's.  Citing the best evidence rule and the sham-affidavit doctrine, Novinger's challenges a declaration submitted by Jayanti

Patel and certain factual assertions in AJD's statement of material facts.  (See, e.g., Doc. 72 ¶¶ 1- 9, 11, 13; Doc. 73 ¶ 1-7).  We reject both challenges.

The best evidence rule provides that the "original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."  FED. R. EVID. 1002.  The best evidence rule, by its plain terms, applies when attempting to prove the contents of a document.  Here, the best evidence rule is inapplicable because the referenced document has been produced.  See StoneCoat of Tex., LLC v. ProCal Stone Design, LLC, No. 4:17CV303, 2019 WL 9899920, at *14 (E.D. Tex. June 28, 2019) (citing I.F. v. Lewisville Indep. Sch. Dist., No. 4:14CV359, 2016 WL 7734555, at *7 (E.D. Tex. Dec. 1, 2016)); see also D'Angelo v. United States, 456 F. Supp. 127, 131 (D. Del. 1978), aff'd, 605 F.2d 1194 (3d Cir. 1979) ("The rule is not applicable when a witness testifies from [p]ersonal knowledge of the matter, even though the same information is contained in a writing."); cf. United States v. Miller, 248 F. App'x 426, 429 (3d Cir. 2007) (nonprecedential) ("[A] party need only produce original documents if a witness testifies to the actual content of a writing.").  Moreover, Patel's declaration is not offered to prove the contents of particular documents.  The documents themselves continue to serve as the definitive source.  He simply offers his perspective and recollection—based on his personal knowledge—of the documents and their significance regarding the scope of the subcontract.  If Patel's statements are inconsistent with certain documents, or any other evidence of record, this inconsistency may be indicative of a factual dispute for the jury, but it does not require exclusion of the declaration.  The court concludes that Patel's declaration

may be considered in the context of the parties' Rule 56 motions.  See Willis v. BW IP Int'l Inc., 811 F. Supp. 2d 1146, 1155 (E.D. Pa. 2011) (citing, *inter alia*, D'Angelo, 456 F. Supp. at 131).

We likewise decline to apply the sham-affidavit doctrine.  The sham-affidavit doctrine allows courts—in their discretion—to disregard an affidavit at summary judgment if it "contradicts earlier deposition testimony without a satisfactory or plausible explanation" and a "genuine, material factual dispute exists."  Daubert v. NRA Grp., LLC, 861 F.3d 382, 389, 391 (3d Cir. 2017) (citations omitted).  AJD offers plausible evidence-based explanations for purported discrepancies.  (See Doc. 80 at 13-16).  Ultimately, those explanations may be unpersuasive or undermined on a fuller record, but we decline to exercise our discretion to exclude the statements at this stage of the litigation.

### A.    Breach of Contract

The parties agree that New Jersey law applies in this case.  (See Doc. 61 at 6 n.2; Doc. 58 at 15 & n.3).  Under New Jersey law, a movant asserting a breach of contract must prove "first, that the parties entered into a contract containing certain terms; second, that [the movant] did what the contract required [the movant] to do; third, that [the nonmovant] did not do what the contract required [the nonmovant] to do, defined as a breach of the contract; and fourth, that [the nonmovant's] breach, or failure to do what the contract required, caused a loss to the [movant]."  Globe Motor Co. v. Igdalev, 139 A.3d 57, 64 (N.J. 2016) (internal quotations marks and citation omitted).  In New Jersey, "[t]he polestar of construction is the intention of the parties to the contract as revealed by the

language used, taken as an entirety." Conway v. 287 Corp. Ctr. Assocs., 901 A.2d 341, 347 (N.J. 2006) (quoting Atl. N. Airlines v. Schwimmer, 96 A.2d 652, 656 (N.J. 1953)).

To determine the parties' intent, courts may consider "the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." Id. (quoting Kearny PBA Local # 21 v. Town of Kearny, 405 A.2d 393, 400 (N.J. 1979)). We also consider the purpose of the contract. See Manahawkin Convalescent v. O'Neill, 85 A.3d 947, 958 (N.J. 2014) (citation omitted). Additionally, "the subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding." Michaels v. Brookchester, Inc., 140 A.2d 199, 204 (N.J. 1958); see also RESTATEMENT (SECOND) OF CONTRACTS § 202 (AM. LAW INST. 1981). "The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." Schor v. FMS Fin. Corp., 814 A.2d 1108, 1113-14 (N.J. Super. Ct. App. Div. 2002) (quoting Brookchester, 140 A.2d at 203-04; Garden State Bldgs. v. First Fid. Bank, 702 A.2d 1315, 1323 (N.J. Super. Ct. App. Div. 1997)); see Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 420-21 (3d Cir. 2013) (summary judgment improper under New Jersey law when "alternative reading of the contested language suggested by [plaintiffs] was both reasonable and supported by objective evidence of the parties' intentions").

1.    *Scope of the Subcontract*

The parties vigorously dispute whether the Mechanical Room Area of the building was within the scope of Novinger's' contractual duties.  To inform that scope, the parties refer to the subcontract's plain language, their negotiations, and the purpose for which AJD contracted Novinger's.

We read contractual terms in accordance with their "plain and ordinary meaning."  GMAC Mortg., LLC v. Willoughby, 165 A.3d 787, 794 (N.J. 2017) (citation omitted).  Specifically, we employ "the meaning that would be ascribed to [the terms] by a reasonably intelligent person who was acquainted with all the operative usages and circumstances surrounding the making of the writing."  YA Glob. Invs., L.P. v. Cliff, 15 A.3d 857, 862-63 (N.J. Super. Ct. App. Div. 2011) (quoting Deerhurst Ests. v. Meadow Homes, Inc., 165 A.2d 543, 551 (N.J. Super. Ct. App. Div. 1960)).  We are also mindful that technical terms and words of art may carry with them a unique meaning under the circumstances.  See Deerhurst Ests., 165 A.2d at 551-52; Borough of Lodi v. Passaic Valley Water Comm'n, No. A-4172-11T4, 2013 WL 6122592, at *5 (N.J. Super. Ct. App. Div. Nov. 22, 2013) (citing RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(b) (AM. LAW. INST. 1981)).

We start with the subcontract's plain text.  The subcontract's "scope of work" rider states that Novinger's shall "design, fabricate, deliver and install a panelized exterior heavy gauge wall system extending from elevation 77'8" to 572'7".  The exterior wall section details to accommodate a panelized light gauge metal stud system, configured as a column and slab cover that will bypass the edge of slab." (Rider A ¶ 24; see also id. at 1).  Novinger's argues that the phrase "panelized wall

system" is a term of art in this context that means "prefabricated units containing several elements," (Doc. 58 at 16; see also Doc. 57-2, Ex. C at 23; Doc. 57-2, Ex. D at 34), and could only apply to the Tower, not the Mechanical Room Area, (Doc. 58 at 17).  AJD notes, however, that the subcontract limits Novinger's' responsibilities by elevation (77'8" to 572'7") and by design specification ("details to accommodate a panelized light gauge metal stud system, configured as a column and slab cover that will bypass the edge of slab").  (Rider A ¶ 24).  In response, Novinger's observes: the Mechanical Room Area requires only skin cladding made of light gauge metal girt system (i.e., metal paneling); the Mechanical Room Area does not bypass the edges of slabs; and the metal skins applied to the Mechanical Room Area do not include metal stud framing or sheathing, as indicated by the subcontract.  (Doc. 58 at 16-18; see Rider A ¶¶ 26, 28 (framing and sheathing)).  In other words, Novinger's argues that AJD's interpretation would render parts of the subcontract superfluous.  Neither party's interpretation is patently unreasonable.

Evidence of the parties' preliminary negotiations provides only limited clarity.  Between February 26, 2014, and May 5, 2014, Novinger's submitted five different work proposals to AJD.  (Doc. 62 ¶¶ 9-34).  Each proposal identified the relevant scope of work to extend from elevation 77'8" to 572'7", and none of them affirmatively included or excluded the Mechanical Room Area.  (Id.; see also Doc. 62 ¶ 3).

All told, the extrinsic evidence of the parties' intent points in several directions.  For every one of AJD's points, Novinger's has a counterpoint, and vice versa.  Our court of appeals has advised that we should deny summary judgment

when the parties offer "alternative reading[s] of the contested language" that are "both reasonable and supported by objective evidence of the parties' intentions." Mylan, 723 F.3d at 420-21.  In sum, substantial ambiguity lies as to the contents, meaning, and timing of the parties' discussions regarding the Mechanical Room Area work.  Given the competing evidence, we will deny both parties' motions regarding the scope of Novinger's' responsibilities under the subcontract.

### 2.    *Notice Provisions*

Novinger's argues that AJD failed to give the necessary notice prior to deducting payment.  (Doc. 58 at 21).  The parties agree that AJD issued a "deduction" for the Mechanical Room Area work, (Doc. 62 ¶ 61; Doc. 68 ¶ 61), but they dispute the application of certain notice provisions.  Novinger's contends the notice requirements found in Article 3, Sections 3.3.2 and 3.4 govern such deductions.  (Doc. 58 at 21-22; Doc. 71 at 20-21).  These sections require separate five- and seven-day notice periods.  Section 3.3.2 also requires that AJD provide a compilation of costs.  (Subcontract, Art. 3 §§ 3.3.2, 3.4).  AJD rejoins that *only* Article 3, Section 3.4 applies.  (Doc. 75 at 16-19).  Section 3.4 permits deductions if AJD provides notice "to commence or continue correction of such default or neglect with diligence and promptness" and Novinger's fails to cure the deficiency within five days of receiving that notice.  (Subcontract, Art. 3 § 3.4).

Novinger's asserts that the term "claim" used in Section 3.3.2 necessarily encompasses the deduction imposed by AJD.  (Doc. 79 at 15-16).  Consequently, the notice provisions in Section 3.4 and Section 3.3.2 can coexist.  Novinger's cites the definition of "claim" used in the prime contract—and incorporated into the

subcontract—to argue that the deduction constitutes a qualifying modification of contract terms.  (See id. (citing Doc. 61-37, Art. 4 § 4.3.1)).  We disagree.  Section 3.4 clearly applies to "deduct[ions]," while Section 3.3.2 clearly applies to affirmative "claims" for expenses undertaken by AJD.  The interpretation of "claim" proffered by Novinger's would render these two provisions duplicative, an interpretation we are careful to avoid.  See Penske Logistics, Inc. v. KLLM, Inc., 285 F. Supp. 2d 468, 474 (D.N.J. 2003) (citations omitted).  AJD imposed a deduction from the amount due under the subcontract; it did not issue a claim.  (See Doc. 61-16).  Section 3.4 therefore applies.

Despite our conclusion that only Section 3.4 applies, we find that a genuine dispute exists as to AJD's compliance with Section 3.4's notice provisions.  The parties agree that, on October 29, 2015, a representative of AJD reached out to Novinger's regarding the latter's declination of Mechanical Room Area work.  (Doc. 62 ¶ 55; Doc. 68 ¶ 55).  The parties, however, do not agree as to the effect of that communication.  AJD contends this communication is sufficient notice to Novinger's that it must either complete the work or be replaced; Novinger's rejoins that the notice provides no such indication.  (Doc. 62 ¶ 55; Doc. 68 ¶ 55).  A similar dispute arises surrounding a November 5, 2015 email.  (Doc. 62 ¶ 56; Doc. 68 ¶ 56).  The parties' disagreement reflects a textbook factual dispute.  Summary judgment is therefore inappropriate.

### 3. *AWMC-Novinger's Dispute*

Novinger's seeks summary judgment with respect to AJD's withholding of payment based upon a separate dispute between Novinger's and AWMC.  (Doc. 58

at 22-23; Doc. 75 at 20-22).  AJD invokes Article 18, paragraph 18.8 of Rider C2, which provides that it may decline to pay if there is evidence of "[c]laims filed or evidence indicating probable filing or making of claims."  (Rider C2, Art. 18 ¶ 18.8).[7] AJD asserts that this language permits it to "withhold payment from Novinger's if there are *any* unresolved claims arising from Novinger's work."  (Doc. 75 at 21 (emphasis added)).  Novinger's responds by invoking Article 18, paragraph 18.17 of Rider C2, which gives AJD the right to withhold payment if there is evidence of "any unpaid obligation, lien or claim for which, if established [AJD] or Owner . . . *might* become liable."  (Rider C2, Art. 18 ¶ 18.17 (emphasis added)).

The court finds that a genuine dispute exists as to the likelihood or probability that AJD may be liable for the Novinger's-AWMC dispute.  The term "claim" used in the prime contract and incorporated into the subcontract contemplates disputes between the Owner, AJD, and Novinger's.  (See Subcontract, Art. 1 § 1.1; id., Art. 2).  When paragraphs 18.8 and 18.17 of Rider C2 are read in light of this definition, it is plain that a withholding of payment must implicate some risk of liability between these parties.  The Rule 56 record is unclear whether AJD faces any exposure as a result of AWMC's claim against Novinger's.  Viewing the facts in a light most favorable to AJD, the court finds a genuine dispute as to whether AJD

---

[7] AJD also invokes Section 12.2 as authority to withhold payment.  This provision only applies to "known indebtedness."  (Subcontract, Art. 12 § 12.2). Although AWMC has sought compensation from Novinger's, the court is unaware of any liability determination.  Thus, we do not consider Section 12.2 to be presently applicable.

will or might become liable, (see Rider C2, Art. 18 ¶¶ 18.8, 18.17), and we will deny summary judgment.[8]

### 4. *Close-Out Documents*

Finally, the parties dispute whether AJD is contractually entitled to withhold the balance of funds due and owing until Novinger's executes certain close-out documents. To complete the Journal Squared Project and receive "final payment," the subcontract requires Novinger's to submit, *inter alia*, a "full and final release and waiver of all liens and claims in connection with the" project. (Rider C2, Art. 18 ¶¶ 18.11, 18.11.1; see also id. ¶ 18.17).

Based on the record before us, and the parties' arguments, the court concludes that a genuine dispute exists as to the applicability and effect of the subcontract's close-out provisions under the unique circumstances of this case—with numerous outstanding claims that would be directly impacted by the contemplated release language. A decision on the propriety of AJD's action to withhold payment must await the resolution of myriad disputes as set forth herein.

### B. *Quantum Meruit*

In addition to its breach-of-contract claim, Novinger's asserts a *quantum meruit* claim to recover costs associated with the removal of certain safety cables and cleaning. (See Doc. 1-2 ¶¶ 11-14). The *quantum meruit* doctrine permits a

---

[8] We acknowledge that Novinger's purports to disclaim AJD's liability for this dispute in a footnote in its summary judgment briefing. (See Doc. 79 at 17 n.10 ("AWMC logically has no claim against AJD, the owner, or the project, [and] AWMC has undoubtedly executed a full and final release absolving all those entities of liability.")). A statement in a brief is not evidence, however, and the evidence that Novinger's has adduced does not foreclose AJD's potential liability as to AWMC.

"performing party to recoup the reasonable value of services rendered," <u>Weichert</u> <u>Co. Realtors v. Ryan</u>, 608 A.2d 280, 285 (N.J. 1992), on the "equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another," <u>id.</u> (citation and internal quotation marks omitted).  To prove a *quantum meruit* claim, a plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." <u>Starkey, Kelly, Blaney & White v. Est. of Nicolaysen</u>, 796 A.2d 238, 242-43 (N.J. 2002) (citations and internal quotation marks omitted).  However, "the existence of an express contract excludes the awarding of relief regarding the same subject matter based on *quantum meruit*." <u>N.Y.-Conn. Dev. Corp. v. Blinds-To-Go (U.S.) Inc.</u>, 159 A.3d 892, 901 (N.J. Super. Ct. App. Div. 2017) (quoting <u>Kas Oriental Rugs, Inc.</u> <u>v. Ellman</u>, 926 A.2d 278, 292 (N.J. Super. Ct. App. Div. 2007) (citing <u>Moser v. Milner</u> <u>Hotels, Inc.</u>, 78 A.2d 393, 280-81 (N.J. 1951))).

   In the instant matter, an express contractual provision applies, (<u>see</u> Doc. 71 at 29 ("Section 5.3 of the subcontract . . . applies.")), and we therefore find no basis for

a *quantum meruit* theory.[9]  Because its *quantum meruit* claim fails on this ground,

we need not consider whether Novinger's released its removal and cleaning claims.

## IV.   Conclusion

We will deny Novinger's' motion and grant in part and deny in part AJD's

motion.  An appropriate order shall issue.


/S/ Christopher C. Conner
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 26, 2021


---

[9] Novinger's' invocation of S.M. Electric Co., Inc. v. Torcon, Inc., No. A-0846-15T3, 2016 WL 6091256 (N.J. Super. Ct. App. Div. Oct. 19, 2016), is unavailing.  The court in S.M. Electric interpreted whether, under its facts, the substance of a letter constituted a "claim" and a "demand"—as opposed to a "change order"—for insurance liability purposes, triggering a separate contractual notice requirement.  See S.M. Electric, 2016 WL 6091256, at *1, 4-5.  The case does not stand for the proposition that *all* post-completion claims for additional compensation based on delays fall outside the scope of change order provisions. (Doc. 71 at 23).  But more importantly, S.M. Electric does not negate Novinger's' acknowledgment that a different contractual provision applies in this case, effectively barring its *quantum meruit* claim under New Jersey law.